[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant proceedings finds its genesis in a certain agreement between the parties dated February 27, 1996. That agreement is appended hereto and fully incorporated herein by reference as exhibit A. Upon the execution of that agreement, it was duly recorded in Volume 1144, at page 0391 of the Danbury Land Records. The defendant (hereafter "Old Field") is "an experienced builder and developer of real estate who is certainly sophisticated . . . not a novice in any sense of the word and between a homeowner who values and cherishes his privacy"[1]
The plaintiff (hereafter "Camiel"), in his quest for privacy, was most concerned about the houses that were being constructed on lots eleven (11), twelve (12) and thirteen (13) as shown on a map attached to the exhibit. The house located on lot number twelve (12), in accordance with the intention of the parties expressed in the agreement, was to be located no further than fifty (50) feet from the closest point of the front property line without Camiel's consent. It would be a single story home with a maximum height of nineteen (19) feet above the grade adjoining the front of the house. There was a provision for an evergreen screen and a further provision that no exterior lighting on lots number eleven (11), twelve (12) and thirteen (13) would be constructed so as to be visible from the Camiel residence, including the front and rear yard, and that no windows in that home would be visible from Camiel's residence including the front and rear yard(s).
The dwelling houses to be constructed on lots eleven (11) and thirteen (13) were also to be located in the approximate location as set forth on the map, which is a portion of the exhibit. It was the intention of the parties that the front of the house would be located no further than fifty (50) feet from the closest point of the front property line, again without Camiel's consent, in order to ensure that the two houses would not be visible from the Camiel residence.
Camiel also obtained the right to install a fence on his CT Page 3504 property off lots eleven (11), twelve (12) and thirteen (13) on the said map, the construction of which or the maintenance of thereof would not be subject to an objection by Old Field. The agreement further provided that it was to run with the land so long as Camiel owned the residence at 210 Middle River Road, and was to be terminated at the time he no longer owned those premises.
The consideration for the agreement was recited to be one ($1) dollar, other valuable consideration and the mutual covenants set forth therein. Camiel also agreed that he would not object to or appeal the decisions on any of the applications pending before the Planning Commission of the city of Danbury in connection with a waiver of a certain section of the subdivision regulations, or for the phasing of the bond requirements, or for any extension of the municipal water system for service to the development. He further agreed not to object in any way to or appeal the validity of the subdivision in connection with the lots which were then being purchased by Old Field. Camiel also was awarded the right to injunctive relief in the event of a breach in the terms and conditions of the agreement, and it concluded by binding the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties.
The house constructed on lot number eleven (11) complies with paragraph two of the agreement regarding location in that it is situated within fifty feet of the front property line, however, due to its size and configuration, it was indeed visible from Camiel's residence. The house constructed on lot number thirteen (13) is situated more than fifty (50) feet from the front property line, and it too was visible from Camiel's property. The visibility of those two dwelling houses, as previously indicated, generated this injunctive proceeding.
The court has visited the site on two separate occasions and has the benefit of observations from lot number thirteen (13), from the lot itself, and from within the dwelling house built on that lot. In addition, it visited lot number eleven (11), and had the opportunity to make observations from that lot, and again, from within the dwelling house on which it stands. On both visits, the court viewed the houses from the Camiel residence and the parcel on which it is located.
As a result of the testimony of the parties, and the court's CT Page 3505 initial visit to the site and its viewing thereof, a temporary injunction was issued ordering and compelling Old Field to take such action as might then be necessary to preclude the houses standing on lots eleven (11) and thirteen (13) from being visible from the Camiel dwelling and the property on which it stands.
Subsequent to the entry of the temporary injunction, Old Field has caused a berm to be constructed and planted with approximately sixty-five (65) white pine trees on lots eleven (11) and twelve (12), which has substantially complied with the agreement and the court's order with two exceptions which were noted on a revisit to the site by the court. The first of the two exceptions is that a portion of the chimney on the dwelling house located on lot number thirteen (13) is visible from the Camiel bedroom. This "violation," however, is declared to be de minimis and will require no additional remedy by Old Field with the exception of the maintenance orders herein. The second area of visibility permits the southeasterly corner of the house on lot number eleven (11) to be seen as one proceeds in the Camiel driveway for a rather short distance. Since that second viewing, Old Field has planted seven (7) additional trees, has stabilized the berm, has installed erosion control netting, and placed topsoil, grass, seed and thatching on or near the berm to stabilize it. If such has not occurred, it will be undertaken as soon as weather conditions permit.
While the court has found substantial compliance by the good faith efforts of the defendant with its temporary injunction previously issued, it nevertheless finds from the evidence presented, its viewing of the premises, and its consideration of the basic agreement between the parties that the plaintiff is indeed entitled to a permanent injunction, which may issue in his favor against the defendant corporation. Therefore, the defendant corporation is ordered to maintain the said berm upon which the said sixty-five (65) or seventy-two (72) white pine trees have been or will be planted; to inspect the berm and trees at reasonable intervals; to fertilize and prune the trees at least annually; and to replace any trees that may have died during the term of this injunction. The defendant is further ordered to enter into and perpetuate a contract with a reputable and reliable nursery or landscape firm or arborist to accomplish the obligation of this order throughout the period of this injunction.
Old Field is also ordered to deposit the sum of ten thousand CT Page 3506 ($10,000) dollars to be held by the escrow agent hereinafter named in an interest bearing account which shall be used by the escrow agent to fund any unpaid obligation of Old Field to maintain the berm and seed it if necessary, fertilize, prune, and/or replace the trees planted thereon. In the event said fund is exhausted prior to the expiration of this injunction, then and in that event, Old Field is directed to furnish the necessary funds to the escrow agent within ten (10) days of the date of notice of such financial insufficiency to continue to fulfill the orders of this injuction.
The law firm of Zeldes, Needle and Cooper, P.C. is hereby designated as the escrow agent for Old Field to utilize, and that firm may serve without bond. Said escrow agent shall not be personally or individually liable for or with respect to any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion, rights or powers conferred upon it by this order. Any entity contracting or otherwise dealing with the escrow agent shall look only to the funds and property under the control of the escrow agent for any claims against the escrow agent or Old Field arising under this order, and the escrow agent shall not be individually liable therefore. In addition thereto, Old Field shall deposit an additional two thousand five hundred ($2500) dollars in a separate interest bearing account to satisfy its obligations in respect to the berm, the plantings, fertilization, thatching, erosion control netting, seeding and prunings which, for justifiable reasons, have not been completed as the date hereof. In the event the additional seven trees, berm maintenance, thatching, erosion control netting, and seeding have been accomplished as of this date, Old Field shall not be required to post the additional two thousand five hundred ($2500) dollars for that purpose.
Old Field shall include in any deed for the sale of lots eleven (11), twelve (12) and thirteen (13) and any structure thereon, language prohibiting the purchaser or his, heirs or its successors from removing or destroying any of the white pine trees until the earlier of Camiel's death, or the sale of his residence, or a period of ten years, whichever first occurs. Said language shall also require that said owner and its heirs, successors and assigns shall provide access to Old Field or its agents, servants or employees for purposes of carrying out the work specified herein. The sale or conveyance of said lot or lots shall not relieve Old Field from its obligations hereunder. CT Page 3507
In the event that the present efforts of Old Field, and the visual barrier created by it or at its direction shall prove ineffective to prevent lots eleven (11), twelve (12) and/or thirteen (13) from being visible from Camiel's dwelling house or property, then and in that event, the parties are ordered to submit a description of the condition which allows those dwelling houses to become visible and their respective proposals for curing this problem to this court.
Camiel's prayer for money damages, as well as his prayer for relief by the removal of part or all of the houses constructed on lots numbered eleven (11) and thirteen (13) are denied. This permanent injunction shall endure until such time as Camiel may die, may sell his property, or ten years from the date of this order, whichever may first occur. Upon the happening of the earlier of any of these three events, this permanent injunction will ipso facto be dissolved and terminated.
Moraghan, J